In the Matter of ROTRAUT L.U. BEINY, as Trustee of the Trust Created by ELISABETH N.F. WEINBERG, as Grantor. ROTRAUT L.U. BEINY, Appellant-Respondent; MARTIN WYNYARD, Respondent-Appellant.

First Department, June 18, 1987

## APPEARANCES OF COUNSEL

*Donald C. Christ* of counsel *(Garrard R. Beeney, Lauretta E. Murdock* and *Daryl A. Libow* with him on the brief; *Sullivan & Cromwell,* attorneys), for Martin Wynyard.

*David F. Dobbins* of counsel *(Richard D. Parsons, Ann Loeb* and *Heather Diddel* with him on the brief; *Patterson, Belknap, Webb & Tyler,* attorneys), for Rotraut L.U. Beiny.

## OPINION OF THE COURT

Per Curiam.

The present motion for suppression of allegedly improperly obtained material and disqualification of counsel comes in the context of a trust accounting proceeding commenced by petitioner Martin Wynyard. Wynyard and his family are the beneficiaries of the trust in question which has as its corpus 45% of the voting shares of the Antique Company of New York (ACNY). The trustee of this trust and respondent to the Wynyard petition is Wynyard's sister, Rotraut L.U. Beiny (hereinafter the Trustee). In addition to being Trustee of the Wynyard trust, Ms. Beiny is herself the beneficiary of trusts containing 55% of the voting and nonvoting shares in ACNY and is ACNY's president and chief executive officer.

Wynyard alleges, *inter alia,* that valuable assets of ACNY,

including antique porcelains, Renaissance jewelry and other art objects have, since 1972, been diverted from ACNY without consideration and placed in two trusts situated in Leichtenstein created by the parties' parents, Hans and Elisabeth Weinberg, but now controlled exclusively by the Trustee and her immediate family. Obviously, the ownership of the allegedly diverted assets in the Leichtenstein trusts is critical to the outcome of the accounting proceeding.

It is petitioner's contention that ACNY's ownership of the assets as to which the claim of wrongful diversion is made is traceable to the parties' father, Hans Weinberg, who amassed a large collection of antique porcelains and other art objects in pre-Nazi Germany. In 1939, Weinberg emigrated to London where he established a business dealing in porcelains, and substantially increased his collection. Petitioner maintains that before leaving London in 1957 to take up residence and center his business in the United States, Weinberg transferred ownership of his entire personal holdings of porcelains to a Panamanian company known as Michelle, the stock of which was owned by his wife Elisabeth. Michelle was liquidated in the early 1960's and its inventory transferred first to a revocable trust created by Elisabeth Weinberg for the benefit of the parties herein, and then to the newly established ACNY. In consideration for the Michelle inventory, ACNY stock was issued to four irrevocable trusts created by Elisabeth Weinberg: the Wynyards were the beneficiaries of two of these trusts which together contained 45% of the voting and nonvoting ACNY stock, while the Beinys were the beneficiaries of the remaining two trusts together containing 55% of the ACNY voting and nonvoting shares. It is as cotrustee of the Wynyard trust having as its corpus 45% of the ACNY voting shares that Beiny appears in the within accounting proceeding.

Beginning with the liquidation of Michelle in 1964 and in subsequent transactions pursuant to which the Michelle inventory came to be owned by ACNY, Hans Weinberg, his family, and his business were represented by the law firm of Greenbaum, Wolff & Ernst. The Greenbaum firm's representation of the Weinberg interests continued until 1973. Hans Weinberg died in 1976.

In March 1985, after the commencement of the within proceeding, Garrard Beeney, of the firm of Sullivan & Cromwell, petitioner's counsel, twice telephoned John Wiener, the liquidator of the by then defunct Greenbaum firm. Beeney

explains that he contacted Wiener "because counsel believed that the Greenbaum firm possessed factual information concerning ownership of the antiques presently held by Beiny in Europe." Wiener refused to give out any information over the phone and indicated that he had no authorization from the executor of the Weinberg estate or anyone else to permit Beeney the access he requested to Greenbaum's files. Thereafter, Beeney issued a combined notice of deposition and subpoena duces tecum commanding Wiener as Greenbaum's liquidator to appear for deposition in two weeks and to bring with him all documents within his control "which reflect, refer or relate to Hans Weinberg, Martin Wynyard, Ruth Wynyard, Rotraut Weinberg Beiny, The Antique Company of New York, Inc., The Antique Porcelain Company, Michelle, Inc., and/or The Antique Porcelain Company, Ltd., London." Accompanying the subpoena was a cover letter representing that the subpoena was served on behalf of Sullivan & Cromwell's client, Martin Wynyard, who the letter states "is the executor and an heir to Mr. Weinberg's will."

Upon receiving the subpoena, which it is conceded was not served on notice to the Trustee, Wiener states that he contacted Beeney and inquired whether the Trustee's authorization was not necessary for the release of the files. Weiner further states that he was assured that the files would be made available to the Trustee's attorneys. According to Wiener, once he had received this assurance, he retrieved the extensive Weinberg files from the Greenbaum warehouse and delivered them to Sullivan & Cromwell. This was done about one week prior to the date of the planned deposition. Shortly after the materials had been turned over, Wiener received notification that his deposition had been canceled.

From April 1 through April 9, 1985, the Trustee was deposed by Sullivan & Cromwell in London. Documents obtained from the Greenbaum liquidator without the knowledge of the Trustee or her attorneys were used extensively to surprise her during her deposition testimony. In view of the Trustee's claim that the documents as to which she was being deposed contained confidential attorney-client communications or evidence thereof, it was stipulated that the Trustee's response to inquiries based on those documents would not constitute a waiver of her claim of privilege. When questioned by the Trustee's counsel, Beeney refused to divulge where or how he had obtained the documents. Only upon returning to New York and conducting his own investigation did the Trustee's

counsel learn that Wiener had turned over the Greenbaum firm's Weinberg files pursuant to the covertly issued subpoena.

Following the Trustee's substitution of counsel in June 1985, her new attorneys contacted Beeney and requested the production of the documents obtained from Wiener. Beeney refused to make the documents available, except in exchange for discovery concessions. The present motion for suppression of the subject documents and disqualification of Sullivan & Cromwell followed in August 1985. As of the time of the motion the Trustee still had not been permitted access to the documents obtained from Wiener, which it must be noted were the originals, and consequently had no way of knowing the extent of the disclosure made.

Upon initial consideration, the Surrogate, although noting that petitioner's attorney "clearly obtained material in a manner not in accord with proper practice in this state", declined to disqualify petitioner's counsel, opining that disqualification was too extreme a punishment. She also declined to grant the motion for suppression, pending examination of the documents obtained from Wiener to determine whether they were in fact shielded from disclosure by attorney-client privilege. The Surrogate ventured that petitioner would be unduly punished by suppression if the documents were otherwise obtainable.

Pursuant to the Surrogate's decision disposing of the motion, the Trustee finally obtained copies of the subject documents and in November 1985, renewed her motion for suppression and disqualification.

The Surrogate, after long consideration, granted the motion in July 1986, to the extent of ordering that all but 7 of the 114 documents concerning which respondent raised the claim of attorney-client privilege be suppressed (133 Misc 2d 950). In this connection, the Surrogate reiterated her previous finding that the documents had been improperly obtained and found that the consequent compromise of attorney-client privilege warranted suppression of the wrongfully obtained information pursuant to CPLR 3103 (c). While granting suppression, the Surrogate adhered to her prior determination not to disqualify Sullivan & Cromwell. She observed that disqualification would deprive petitioner Wynyard of the valued right to be represented by counsel of his choosing and would impose upon him a financial penalty since new counsel would require time to become familiar with the case. Moreover, the Surrogate noted

that, unlike most cases in which disqualification had been granted, here the counsel as to which disqualification was sought had never represented the party seeking counsel's removal, and had not, as a result of a prior attorney-client relationship, gained access to the "myriad of information" ordinarily requiring disqualification. In view of the "finite" number of documents involved, and the relatively small amount of information they contained, the Surrogate ventured the Trustee's interests would be adequately protected by suppression.

The Trustee appealed from the Surrogate's orders insofar as they denied disqualification, and petitioner cross-appealed as to the grant of that part of the Trustee's motion requesting suppression.

█ Initially, we agree with the Surrogate that suppression was appropriate in the circumstances here obtaining. CPLR 3103 (c) provides: "Suppression of information improperly obtained. If any disclosure under this article has been improperly or irregularly obtained so that a substantial right of a party is prejudiced, the court, on motion, may make an appropriate order, including an order that the information be suppressed."

There can be no question that Sullivan & Cromwell did not properly obtain the Greenbaum firm's files on the Weinbergs. Where, as here, discovery is conducted as against a nonparty, adverse parties must be afforded notice. If the discovery is to be by means of deposition, notice must be given pursuant to CPLR 3107: "A party desiring to take the deposition of *any person upon oral examination shall give to each party twenty days' notice,* unless the court orders otherwise." (Emphasis added.) Clearly, petitioner's counsel failed to abide by this very basic rule when it served the March 8, 1985 combined notice of deposition and subpoena duces tecum upon the Greenbaum liquidator without notice to the Trustee.

Sullivan & Cromwell makes the rather obscure argument that its obligation to notify the Trustee pursuant to CPLR 3107 was somehow excused by the deposition's cancellation. Obviously, this is not the case. The statute is quite clear: the Trustee was entitled to 20 days' notice of Wiener's deposition. The notice obligation was already overdue at the time of the subpoena's issuance as the deposition demanded in the subpoena was scheduled to be held in 14, not 20, days' time. The subsequent decision to cancel the deposition did not retrospec-

tively excuse Sullivan & Cromwell's utter failure initially to comply with the statute's notice requirements. For Sullivan & Cromwell to describe its performance in this regard as "an earnest, even if mistaken, attempt to comply with the specific requirements of CPLR 3107", is preposterous.

It is, in addition, particularly disingenuous to suggest, as Sullivan & Cromwell does, that cancellation of Wiener's deposition in the circumstances here obtaining rendered the failure to give notice pursuant to CPLR 3107 harmless. It would be one thing if no discovery had been obtained, but that is not the case. At the time the deposition was canceled, Sullivan & Cromwell had already received the materials requested in the combined notice of deposition and subpoena duces tecum.

Manifestly, Sullivan & Cromwell had little interest in deposing Wiener who had already informed Beeney that he had no information to give concerning the matters in which the Greenbaum firm represented the Weinbergs. As the cancellation of Wiener's deposition demonstrates with consummate clarity, Sullivan & Cromwell's real interest was in obtaining the Greenbaum files. Although Sullivan & Cromwell professes to know of no rule preventing it from using an attorney's subpoena, as it did, to compel the clandestine production of documents from a nonparty who is not to be deposed, the law is otherwise. CPLR 3120 (b) sets forth the proper procedure for obtaining discovery and production without deposition from a nonparty:

"*Rule 3120. Discovery and production of documents and things for inspection, testing, copying or photographing* * * *

"(b) As against non-party. A person not a party may be directed by order to do whatever a party may be directed to do under subdivision (a). *The motion for such order shall be on notice to all adverse parties; the non-party shall be served with the notice of motion in the same manner as a summons.*" (Emphasis added.)

We do not think that this provision, designed to assure that nonparties will not be unduly burdened with discovery demands and that discovery from nonparties is conducted in a fair and open manner, can be avoided by resorting to the use of covertly issued attorneys' subpoenas. (*See*, Siegel, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C3102:2, C3111:1, C3120:12, at 262, 409, 522; *see also*, 3A Weinstein-Korn-Miller, NY Civ Prac ¶ 3120.08.) Sullivan & Cromwell's contention to the contrary is not worthy of further comment.

The above-cited rules governing the conduct of discovery and dictating that parties be notified of deposition and disclosure demands made upon nonparties, are well known. Indeed, as the Surrogate observed in her decision disposing of the Trustee's original motion, "[i]t is hornbook law that a party is entitled to a notice of deposition when a subpoena is served on a non-party witness." We do not believe that Sullivan & Cromwell was ignorant of these rules, nor would its ignorance be excusable. These are not trivial or seldom invoked provisions; they are fundamental to the orderly and fair conduct of pretrial litigation and are daily put to use by litigants and the courts.

The inference which sadly follows is that, far from making an "earnest" attempt to comply with the rules, Sullivan & Cromwell chose to chart a course which it knew to be at variance with acceptable discovery practice so as to obtain by stealth that which could not be readily obtained through proper channels. This inference unfortunately derives substantial support from our consideration of the entire sequence of events pursuant to which the Greenbaum files came into Sullivan & Cromwell's possession and were thereafter retained and used.

From the outset, it must have been clear to Sullivan & Cromwell that obtaining the Greenbaum files would not be easy. Sullivan & Cromwell doubtless understood that any request for the production of the files made properly on notice to the Trustee would be met with vigorous opposition. The Trustee would, of course, claim that the materials sought, having as their source a law firm's files, were shielded from disclosure by attorney-client privilege (CPLR 3101 [b]; 4503 [a]; 3103 [a]). In addition to the all but inevitable assertion of privilege, it was to be anticipated that the Trustee would object to any demand for disclosure served upon the Greenbaum liquidator even remotely resembling that made in the March 8, 1985 subpoena duces tecum, on the ground that much of what was sought was neither material nor necessary to petitioner Wynyard's case. (CPLR 3101 [a]; 3103 [a]). Indeed, it can be safely said that no court would have permitted Sullivan & Cromwell access to "all documents [in the Greenbaum liquidator's] possession, custody or control which reflect, refer or relate to Hans Weinberg, Martin Wynyard, Rotraut Weinberg Beiny, The Antique Company of New York, Inc., The Antique Porcelain Company, Ltd., London." So indiscriminate a demand for material from a nonparty, much of which

likely contained evidence of confidential communications between attorney and client, would certainly have been disallowed. *(See, e.g., Pacer v Clarence A. Hackett, Inc.,* 30 AD2d 934.)* Nor can it be supposed that Sullivan & Cromwell was in a position readily to frame a better focused demand, for apart from its general expectation that the Greenbaum files contained valuable information, there is no indication that Sullivan & Cromwell knew what documents were in the files, let alone which of those it wished to examine. Finally, as Sullivan & Cromwell was apparently unable to specify what it was looking for, it would also have been unable to indicate why it was necessary to obtain the unidentified object of its inquiry from a source as sensitive as a law firm's files. Surely, a court would not permit disclosure from a nonparty law firm's client records if the information sought was otherwise obtainable (CPLR 3101 [a] [4]; *Pacer v Clarence A. Hackett, Inc. supra).*

Faced with these substantive and procedural impediments to the rapid and sweeping disclosure it was after, Sullivan & Cromwell apparently resolved to avoid the frustration of the adversary process and treat discovery as a private matter between it and the Greenbaum liquidator. It is, of course, undisputed that in March 1985, Beeney initiated private telephone contacts with Wiener during which Beeney proposed that Sullivan & Cromwell be permitted access to files covering those matters in which the Greenbaum firm had represented the Weinbergs. We note that Beeney made this request knowing full well that the files he asked to examine had been generated over the course of more than 10 years of legal representation, and that they certainly contained much in the way of privileged material. When Wiener refused Beeney's request which was nothing more than an invitation to divulge client confidences in violation of CPLR 4503 (a) and Code of Professional Responsibility DR 4-101, noting at the time of his refusal that he had no authorization from anyone, and in particular from the executor of the Weinberg estate, to release the files, Beeney attempted to elicit Wiener's cooperation by slightly different but no less private means.

The covertly served March 8, 1985 subpoena duces tecum followed, accompanied by the cover letter representing that petitioner Wynyard on whose behalf the subpoena was issued "is the executor and an heir to Mr. Weinberg's will". The natural effect of this representation was to create the impression that Wynyard as executor of the Weinberg estate had authorized the release of the Greenbaum files. Of course, as

Beeney well knew, the Weinberg will had never been probated and Wynyard, therefore, had never been appointed executor of the Weinberg estate. While it is questionable whether even a duly appointed executor would have had the power to waive the decedent's attorney-client privilege *(see, Matter of Williams,* 179 Misc 805; *Matter of Alexander,* 205 Misc 894; *but see, Matter of Fishman,* 32 AD2d 1063, *affd* 27 NY2d 809), it is quite certain that one merely named as executor in an unprobated will would have had no authority whatsoever to do so. Wynyard's status then as a named executor in an unprobated will was utterly irrelevant to the legitimacy of the disclosure demand made in the subpoena duces tecum. It is, therefore, exceedingly difficult to understand why petitioner's counsel found it worthy of mention in the March 8, 1985 cover letter, if not to mislead Wiener whose cooperation was essential to the conduct of secret discovery, into believing that the authorization for the release of the Greenbaum files, which he previously indicated was lacking, had in fact been given. Certainly, the highly deceptive nature of the representation is self-evident.

When Wiener, whose account of what transpired we find completely creditworthy,[1] was still reluctant to make the files available without Mrs. Beiny's authorization, Beeney again resorted to deception to elicit Wiener's quiet cooperation; Wiener was assured by Beeney that the files would be made available to Mrs. Beiny's attorneys. Thus assured, Wiener retrieved the files and had them delivered to Sullivan & Cromwell. As subsequent events demonstrate beyond doubt, Beeney had not the slightest intention of making the files available to the Trustee or her counsel.

The object of Sullivan & Cromwell's clandestine discovery having been attained without any of the unpleasantness or frustration which would have resulted had the applicable provisions of the CPLR been complied with, Wiener's deposition was promptly canceled. Thereafter, the files were retained by Sullivan & Cromwell. No effort was made to notify the Trustee that the files were in Sullivan & Cromwell's possession. Indeed, that obviously would have been contrary to

---

1. As petitioner points out the Surrogate failed to make any finding resolving the inconsistency between the Wiener and Beeney affidavits respecting Beeney's alleged representation that the files would be made available to the Trustee. As the finding is clearly indicated, we make it *(see,* CPLR 5501 [c]), resolving the discrepancy in accordance with Wiener's account.

Sullivan & Cromwell's purpose; the documents were used extensively some two weeks after they had been obtained to surprise the Trustee at her London deposition.

Even subsequent to the Trustee's deposition, Sullivan & Cromwell continued to refuse to divulge from where the documents had come, or precisely what items it had covertly acquired from Wiener. As the correspondence in the record shows, Sullivan & Cromwell evidently found it advantageous to continue withholding the improperly obtained material for use as a bargaining chip so as to extract further discovery from the Trustee. As noted, at no point did Sullivan & Cromwell voluntarily and unconditionally permit the Trustee access to the Greenbaum files. And it was not until the Surrogate directed that the originals be delivered to the court and copies to the Trustee's attorneys, that the Trustee was finally apprised of what had been obtained from the Greenbaum liquidator.

We cannot but conclude from the above-detailed course of conduct that Sullivan & Cromwell's failure to abide by the CPLR notice provisions was part of a deliberate and thoroughly unprincipled effort to obtain a litigational advantage by whatever means seemed useful, including deceit. That the Trustee has been prejudiced by Sullivan & Cromwell's grossly improper conduct cannot be questioned. She has been deprived of all opportunity to contest the disclosure of the Greenbaum files and has been surprised at her deposition. She has, in addition, been put to the expense of litigating the present motion which has now consumed nearly two years' time and untold resources. All this would have been completely unnecessary but for Sullivan & Cromwell's willful avoidance of fundamental and easily understood rules governing the conduct of discovery.

We think that on the basis of the foregoing alone, suppression of the improperly obtained materials would have been warranted pursuant to CPLR 3103 (c). (See, *Monserrate v Upper Ct. St. Book Store,* 49 NY2d 306; *Juskowitz v Hahn,* 56 Misc 2d 647.) There is no reason why a civil litigant should receive any benefit from information acquired in a manner both deliberate and wrongful. We perceive no harshness to the affected parties, or disservice to the truth-seeking process, in preventing such benefit by means of suppression, particularly where, as here, the order of suppression ultimately permits the use of the information suppressed provided it is regularly

obtained from proper and independently developed sources.[2] Manifestly, it is not unduly harsh to expect and indeed to require that civil litigants gather the information needed to prosecute or defend their actions in conformity with the applicable CPLR provisions.

Although the use of the improperly obtained materials to surprise the Trustee at her deposition and their retention thereafter for the purpose of eliciting discovery concessions would seem sufficiently prejudicial to support the issuance of a suppression order pursuant to CPLR 3103 (c), there is here the additional consideration that, as the Surrogate found, much of the material delivered to Sullivan & Cromwell by the Greenbaum liquidator was immune from disclosure by reason of attorney-client privilege. It is axiomatic that privileged material may not be disclosed *(Cirale v 80 Pine St. Corp.,* 35 NY2d 113; CPLR 3101 [b]). Thus, had the Trustee been notified of the disclosure demand made upon the Greenbaum liquidator as she should have been, it is clear that she could have successfully moved pursuant to CPLR 3103 (a) for a protective order preventing much, if not all, the disclosure here in question. Indeed, had petitioner's disclosure demand come to the court's attention, it is to be expected that the court on its own initiative would have acted to prevent the unauthorized release of privileged information *(see,* CPLR 3103 [a]; 4503 [a]).

It is important to note at this juncture that the essential consideration upon a 3103 (a) motion for a protective order on the ground of privilege is whether the material as to which disclosure is sought is in fact privileged. The grant of a protective order on the ground of privilege does not necessarily depend upon the prejudice which disclosure would cause a party;[3] it depends more broadly upon the existence of a privilege which has not been waived. It is not the party per se who is protected by a CPLR 3103 (a) order preventing disclosure of privileged material, but the holder of the privilege.

---

2. The Surrogate's order provided in pertinent part "such suppression shall include all past and future uses of said documents and shall further include all testimony respecting such documents and information obtained from or contained in said documents *unless otherwise obtained from an independently developed, unrelated, non-privileged and unsuppressed source."* (Emphasis added.)

3. Regarding protective orders issued pursuant thereto, CPLR 3103 (a) states "Such order shall be designed to prevent unreasonable annoyance, expense, embarrassment, disadvantage, or other prejudice *to any person* or the courts." (Emphasis added.)

The present case poses a situation in which both the Trustee and the court were foreclosed by the deliberate strategy of petitioner's counsel from acting pursuant to CPLR 3103 (a) to prevent the disclosure of privileged material. The subsequent remedial efforts of the court and the Trustee ought not to depend upon a showing of prejudice to a party (here the Trustee) any more than such a showing would have been necessary initially to support the issuance of a protective order. The point to be made is that regardless of whether suppression of the improperly obtained privileged material was appropriate pursuant to CPLR 3103 (c), it was in any case necessary to fulfill to the extent possible when disclosure was already a fait accompli, the command of CPLR 3101 (b) that "[U]pon objection by a party privileged matter shall not be obtainable." Obviously, the fact that privileged material has been covertly obtained does not make it "obtainable" within the meaning of the statute. When that which is not obtainable has been obtained, the only appropriate judicial response is to attempt through suppression to restore the status quo prior to the unauthorized disclosure. Suppression in this case then was not only appropriate pursuant to CPLR 3103 (c) to protect the Trustee's interests which had in fact been prejudiced, it was in addition necessary to preserve, to the extent still possible, the confidences of the Greenbaum firm's clients and to prevent erosion of the long-standing policy which the privilege here in question exists to protect, namely, that of encouraging frank and open interchange between attorney and client. (See, Matter of Priest v Hennessy, 51 NY2d 62, 67; Matter of Jacqueline F., 47 NY2d 215, 218; Hurlburt v Hurlburt, 128 NY 420, 424; see also, 8 Wigmore, Evidence § 2291 [McNaughton rev 1961]; Richardson, Evidence § 410 [Prince 10th ed].)

The Surrogate apparently based her decision to suppress on both the privileged nature of the improperly disclosed material and the prejudice the disclosure worked upon the Trustee. This involved the Surrogate in a lengthy examination of the Greenbaum files to determine which of the documents contained therein were privileged. It would appear that this was unnecessary since, regardless of whether the materials were privileged, the highly improper manner in which they were obtained combined with their use by petitioner's counsel to the Trustee's detriment would have constituted a sufficient basis for suppression pursuant to CPLR 3103 (c). Nevertheless, while perhaps cumbersome, the Surrogate's approach was not wrong, and we affirm her order of July 16, 1986, insofar as it

granted suppression, for the reasons stated in her accompanying memorandum decision dated July 8, 1986. We do, however, address briefly the points raised by petitioner on the suppression issue.

Our examination of the suppressed materials confirms that they do in fact contain evidence of confidential attorney-client communications immune from disclosure pursuant to CPLR 4503 (a). Further, it is evident that there has been no waiver of privilege by the Greenbaum clients whose confidences have been disclosed. Certainly, there is no indication that Hans Weinberg, his wife, or any of the family businesses waived their attorney-client privilege. And while petitioner makes much of the fact that the Trustee did not consult with the Greenbaum firm on personal matters, this is really quite irrelevant. As the Surrogate found, the Trustee consulted extensively with Greenbaum both as her father's trusted agent and in her capacity as an officer of the family business. Even if the privilege were not hers to claim personally, it would still exist unwaived as to the persons and entities on whose behalf she consulted with Greenbaum and would encompass her communications as a personal and corporate agent.

While petitioner Wynyard may, of course, waive whatever privilege he has, his waiver, contrary to his contention on appeal, is ineffective respecting the documents as to which suppression was ordered. There is not the slightest indication that Wynyard took part even remotely in the attorney-client consultations documented in the suppressed materials. Nor is there any basis for Wynyard's claim that the communications at issue, although privileged from the rest of the world, were not meant to be kept from him. If petitioner wishes, in effect, to waive privilege as to certain communications, he must first establish that the privilege is, in fact, his to waive. He has not done so and cannot compensate for his failure in this regard by urging erroneously as he does that it is the Trustee's burden to establish separately that the concededly privileged material is also privileged as to him. We note that the cases cited by petitioner in support of his contention that he is entitled to access to the suppressed materials simply do not support the proposition he would advance. The mere fact that petitioner may have been interested in the privileged communications of others does not establish any right of access thereto. Generally, it is only where clients have been jointly represented as to the privileged subject matter that one party

will be permitted to obtain disclosure over the other's claim of privilege. *(See, e.g., Wallace v Wallace,* 216 NY 28; *Matter of Friedman,* 64 AD2d 70; *Matter of Swantee,* 90 Misc 2d 519; *see also,* 8 Wigmore, Evidence § 2312 [McNaughton rev 1961].) Certainly, there is no basis to make an exception to this rule in the present circumstances.

Finally, we reject petitioner's attempt to invoke policy considerations to justify disclosure of the privileged material here at issue. Petitioner urges that "The interests of justice compel that [he] be permitted to use these documents to demonstrate the Trustee's fraud upon him and upon the court." At this stage of the proceedings, however, where the merits of the controversy are far from clear, the interests of justice compel nothing more than that discovery be conducted according to the rules and within the limitations set forth in the CPLR. Certainly, petitioner acquires no special right to the disclosure of privileged information by claiming that it will be helpful or even necessary to the proof of his case. The Court of Appeals has stated the applicable rule well in *Cirale v 80 Pine St. Corp.* (35 NY2d 113, 117, *supra):* "Of course, if the information sought is in fact privileged, it is not subject to disclosure no matter how strong the showing of need or relevancy (CPLR 3101, subd. [b]; see, also, Practice Commentary, Siegel, McKinney's Cons. Laws of N.Y., Book 7B, CPLR 3101, p. 29)." Petitioner's suggestion that the present matter is akin to the situation in *Matter of Jacqueline F.* (47 NY2d 215, *supra)* where the court sanctioned very limited disclosure of otherwise privileged attorney-client communications to prevent evasion of a child custody decree is farfetched, to say the least.

Whether or not it can be said that the Trustee's attorney-client privilege has been compromised, and it would appear that it has at least with regard to those consultations the Trustee had with Greenbaum on behalf of the family businesses, it is clear beyond doubt that she has been prejudiced by the unauthorized disclosure to petitioner of material not otherwise obtainable. Much of the material contains evidence of communications between the Trustee and the Greenbaum firm in confidence, the release of which is at a minimum embarrassing to the Trustee and, more importantly, is damaging to her prospects in the current litigation. That this disclosure could have been prevented by the Trustee had her opportunity to do so not been subverted by petitioner's counsel is now decidedly plain. In view of the fact that the documents

involved were not otherwise obtainable, the very deprivation by petitioner's counsel of the Trustee's opportunity to contest the disclosure before the fact constitutes substantial prejudice under CPLR 3103 (c). Having made this observation, it is important to reiterate that although the case for suppression is made compelling by the fact that the matter disclosed was privileged and, therefore, not otherwise obtainable, suppression on terms imposed by the Surrogate would have been warranted in this case even if the material were otherwise obtainable. It is not only the unauthorized disclosure of the documents from the Greenbaum files that has prejudiced the Trustee, but as noted, their actual use in the present litigation.

■ The question now arises whether the suppression ordered by the Surrogate adequately protects the Trustee against further use of the information improperly culled by Sullivan & Cromwell from the Greenbaum files, and whether, given the blatant abuse with which we are here confronted, involving willful disregard of procedural rules, deceit, and the covert acquisition of otherwise unobtainable privileged material, suppression is sufficient to deter such conduct and insure the integrity of the process. We conclude that suppression, while necessary, does not adequately address these concerns and accordingly, that Sullivan & Cromwell must be disqualified from further participation in this trust accounting proceeding.

Although it is true, as the Surrogate observed, that we do not here deal with a situation in which an attorney is representing interests adverse to those of a former client in a subsequent related matter, it does not, in our view, follow that disqualification is, therefore, inappropriate. To rule out disqualification in the present circumstances on the ground that the Trustee has not been a client of Sullivan & Cromwell, exalts form over substance.

The fact of an attorney's prior representation of a client is significant in terms of the litigational stance he or she may prospectively assume toward that client not because of the prior relationship alone, but because of what the attorney has come to know as a result. Here, Sullivan & Cromwell has come to know much that is relevant to the present proceeding through the conduit of another law firm's files. What knowledge has been gained has been acquired by improper means and much of what has been learned was meant to go no further than the confines of the Greenbaum law office. Sulli-

van & Cromwell, which has remained in possession of the Greenbaum files for some two years, has made extensive use of their contents.

While documents may be effectively suppressed, the information gathered from them cannot be so easily contained. We simply do not know whether the information acquired from the Greenbaum files will subsequently be used by Sullivan & Cromwell, for even if Sullivan & Cromwell attempts to abide by the Surrogate's suppression order, there is no way of assuring that the tainted knowledge will not subtly influence its future conduct of the litigation. *(See, Emle Indus. v Patentex, Inc.,* 478 F2d 562, 570-572 [2d Cir 1973].)

Nor do we think that under the circumstances of this case a court should be required to assume the onerous task of constantly tracing the provenance of the information employed by petitioner's counsel to determine if it is really obtained from an "independently developed, unrelated, non-privileged, unsuppressed source." While the amount of tainted information may be "finite", it is not small. As noted, the Greenbaum files reflect the firm's representation of the Weinberg family and its businesses for a period of more than 10 years. And among the matters to which the documents refer are transactions involving the disposition of the very assets whose ownership is at issue in this proceeding.[4] In direct or indirect reliance upon this core of information, Sullivan & Cromwell has undoubtedly obtained other information during the extended period it has retained the files and has been placed in a position to obtain still more information. If there has not resulted a "myriad of information" there is at least an empirical web of some complexity; it would at this point be virtually impossible to prevent what has been suppressed from playing some role in Sullivan & Cromwell's decision making or to keep the tainted information which it possesses from surreptitiously finding its way back into the proceeding. Thus, as a practical matter, we think it necessary to disqualify Sullivan & Cromwell in order to assure, insofar as is possible, the fairness of the proceeding. *(See, Desbiens v Ford Motor Co.,* 81 AD2d 707.)

---

4. We note in this regard that petitioner's attempt on appeal to minimize the importance of the information obtained from Greenbaum is fatally undermined by petitioner's prior admissions that "the documents are probative of the true owner of these assets held by the Leichtenstein entities" and that, "the documents demonstrate that the Trustee * * * has transferred to entities she controlled in Europe assets belonging to Dr. Wynyard's trust".

It is important to stress that the rationale for the disqualification here imposed is not fundamentally different from that employed in situations where an attorney undertakes to represent interests adverse to those of a former or present client. What is to be prevented is the misuse of information disclosed in confidence between attorney and client. *(See, Board of Educ. v Nyquist,* 590 F2d 1241, 1246 [2d Cir 1979].) While the question of disqualification ordinarily arises when the same attorney or firm represents or has represented parties whose interests are adverse in related matters, as the present case demonstrates, this is not the only factual configuration in which information divulged to an attorney in confidence may come to be used for unauthorized ends. *(See, e.g., Fund of Funds v Andersen & Co,* 567 F2d 225 [2d Cir 1977]; *Cinema 5 v Cinerama, Inc.,* 528 F2d 1384 [2d Cir 1976]; *Desbiens v Ford Motor Co., supra.)* Here, Sullivan & Cromwell has clandestinely obtained the entire files of the Greenbaum firm generated over more than 10 years respecting matters in which it represented the Weinberg interests and has used the information thus acquired, much of which is confidential, to advance litigational ends unsanctioned by Greenbaum's clients. Clearly, this sort of abuse of confidential information, whether by the original attorney or one to whom the information has been illicitly transferred, cannot be countenanced. It is serious enough when client privilege is compromised, but when the information obtained as a consequence is then put to use in legal proceedings to prejudice one of those whose confidences have been revealed (here the Trustee) the sanction of disqualification must be imposed. This is necessary not only to sanitize the proceeding but to prevent the offending lawyer or firm from deriving any further benefit from information obtained and used in violation of basic ethical precepts and statutory obligations.

Unlike most disqualification situations where the knowledge eventually requiring disqualification is acquired innocently by the attorney in the course of affording a client representation, here, the knowledge has been obtained by improper design and the use of the information is not merely a prospect to be avoided by prophylactic disqualification, but an accomplished fact. In these respects the abuse with which we are presently concerned is far more serious than that which is ordinarily addressed or sought to be averted where disqualification is ordered. *(Cf., Greene v Greene,* 47 NY2d 447, 453.)

It is, of course, regrettable that the action we now find it

necessary to take will deprive petitioner of his chosen counsel. This is, however, unavoidable given the gravity of the conduct involved and its highly prejudicial consequences for the Trustee. Confronted as we are with a course of activity exhibiting a complete and deliberate disregard for the process by which discovery is to be conducted and a total insensitivity to the strict ethical and legal limitations placed upon the disclosure and use of privileged material, to impose a sanction short of disqualification would be to treat the conduct at issue with a degree of lenity practically inviting its recurrence. Our principal concern under the circumstances must be to preserve the integrity of the process by which rights are vindicated.

Accordingly, the order of the Surrogate, New York County (Marie M. Lambert, S.), entered July 17, 1986, which upon renewal granted the Trustee's motion for suppression to the extent of suppressing some 107 improperly obtained documents, but which denied that part of the Trustee's motion seeking disqualification of petitioner Wynyard's counsel, should be modified, on the law and the facts, and in the exercise of discretion, to the extent of granting that part of the Trustee's motion seeking disqualification of petitioner's counsel, and, except as modified, the order appealed should be affirmed, without costs.

The appeal from the order of the Surrogate, New York County (Marie M. Lambert, S.), entered December 5, 1985, should be dismissed as academic, without costs.

KUPFERMAN, J. (dissenting in part). I would affirm for the reasons stated by Surrogate Lambert. (Cf., S & S Hotel Ventures Ltd. Partnership v 777 S. H. Corp., 69 NY2d 437; Ceramco, Inc. v Lee Pharms., 510 F2d 268 [2d Cir 1975].)

MURPHY, P. J., MILONAS, KASSAL and WALLACH, JJ., concur; KUPFERMAN, J., dissents in part in an opinion.

Order, Surrogate's Court, New York County, entered July 17, 1986, modified, on the law and the facts, and in the exercise of discretion, to the extent of granting that part of the Trustee's motion seeking disqualification of petitioner's counsel, and, except as so modified, said order is affirmed, without costs and without disbursements. Appeal from order of said court entered on December 5, 1985 is dismissed, as academic, without costs and without disbursements.